**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Vincent J. Sanchez,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **Operator Butterworth and Operator Rushin,** | **NO.  24-6884** |
| **Defendants.** | |

**MEMORANDUM OPINION**

*Pro se* Plaintiff Vincent J. Sanchez brings this civil rights action under 42 U.S.C. § 1983 alleging that correctional officers at Berks County Jail ("BCJ") violated his Fourteenth Amendment due process rights.  Section 1983 creates a "species of tort liability" under which a person subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution" by a state official can bring suit against that official.  *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976); 42 U.S.C. § 1983.  Here, Sanchez's § 1983 claim is premised on Butterworth and Rushin's alleged violation of his Fourteenth Amendment rights to be free from excessive force as a pretrial detainee.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56, Fed. R. Civ. P. 56, arguing they are entitled to qualified immunity.  For the reasons below, their motion will be denied.

Sanchez's claim arises from an interaction with correctional officers as they were transferring him to a disciplinary segregation unit.  Sanchez, then a pretrial detainee, sat alone in a corridor of the jail.  At some earlier point, a BCJ staff member had received a sexually explicit document—purportedly from Sanchez—and then reported him.  Sanchez was waiting on a bench as officers conferred inside a private office about the document.  What followed was recorded in

1

its entirety by two surveillance cameras, positioned at opposite ends of the jail hallway, and an audio-enabled body-worn camera.

The recordings show Defendant Butterworth, Defendant Rushin, and non-party Lieutenant Nemeth emerging from the administrative office. They told Sanchez that, due to the incident, he would be transferred to the "D Unit," the disciplinary segregation unit. Sanchez described the sexually explicit document as an "accident," categorizing it as a private "coping method." Unmoved by his explanation, the officers ordered him to stand up, turn around, and put his hands behind his back. He stood and turned as commanded, but kept his left arm in front of him, which prompted the officers to tell him—three times—to put both hands behind his back.

Sanchez responded to the officers, in a raised voice, "You don't have to try to intimidate me, bro. That has nothing to do with what's going on. Who the fuck wants to go through something like that?" The officers offered a mild response, telling him to relax. At this point, two additional correctional officers had walked into the hallway. Butterworth gripped Sanchez tightly by his arm and shirt collar, and the escort began the walk to the D Unit.

The situation rapidly devolved from there. After a few steps, Sanchez stopped and turned quickly to face Butterworth. He yelled: "Grabbing me ain't going to do nothing, bro." Rushin, who had been walking in front of Sanchez, reacted immediately. He spun around, grabbed Sanchez's arm, and whipped him against the wall as Butterworth also maintained his grip. Sanchez's head and torso appeared to hit the wall first. One of his legs rose up and back between Butterworth's legs. Butterworth asked Sanchez if he was trying to kick him, to which Sanchez answered, "I am not kicking you. I am getting my face off of you from planting it on the fucking wall." "Yeah?" Butterworth responded, as he pushed Sanchez's face against the wall with his balled fist.

2

Sanchez then jerked backward.  Again, Rushin reacted, yanking Sanchez by his handcuffs to pull him to the ground.  With Sanchez now lying face down, Rushin put his knee on Sanchez's back.  Meanwhile, Butterworth restrained Sanchez's legs and Lieutenant Nemeth held down his shoulder.  As Sanchez complained that the officers were using excessive force, Rushin put a spit hood over his head.  Then, after approximately thirty seconds—the time it took to secure the spit hood—Rushin removed his knee from Sanchez's back.

The officers tried to quell Sanchez as he loudly complained that they were hurting his right ankle, which he said had been "fucked up."  Unable to pacify Sanchez, the officers called for a restraining chair.  They completed the transfer with Sanchez bound in it.

Sanchez claims that as a result of the incident he suffers from migraines and that the force used to restrain his legs re-aggravated an injury to his right ankle.  Indeed, he testified in his deposition that it is now difficult to stand for long periods and that he avoids jail-yard exercise.

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law."  *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (citation omitted).  And an issue of material fact is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248-49, 252.

The moving party has the initial burden of demonstrating the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then present affirmative evidence from which a reasonable trier of fact could return a verdict in its favor. *Anderson*, 477 U.S. at 257. Summary judgment will be entered if the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. In evaluating a summary judgment motion, the facts are generally viewed in the light most favorable to the nonmoving party, and any reasonable inferences are made in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). "In qualified-immunity cases, that 'usually means adopting the plaintiff's version of the facts,'" unless there is "reliable video" that "'blatantly contradict[s]'" the plaintiff's account. *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021) (ellipsis omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Qualified immunity is a doctrine designed to give "government officials breathing room" by shielding them from suit and from liability when they "make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011). The defense is appropriately raised in § 1983 suits alleging excessive force. *See, e.g., Jacobs*, 8 F.4th at 192-93. At summary judgment, the burden is on Butterworth and Rushin to establish their entitlement to qualified immunity. *Mack v. Yost,* 63 F.4th 211, 227 (3d Cir. 2023) (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2015)). To do so, they must show either that: (1) the facts alleged do not establish a constitutional violation; or, (2) the right at issue was not "clearly established" at the time of the alleged violation. *Jacobs*, 8 F.4th at 193, 196.

Generally, a court has discretion to address either prong of the qualified immunity analysis in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But here, to the extent Butterworth and Rushin raised an argument under the "clearly established" prong, they did so for

the first time in their reply brief. It is therefore considered forfeited. *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 180 n.12 (3d Cir. 2020). Thus, the focus of the qualified immunity analysis is only on whether the facts of record do not establish that Butterworth and Rushin violated Sanchez's constitutional right to be free from excessive use of force.

Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have the right to be free from the use of excessive force. *Kingsley*, 576 U.S. at 396-98; *see also Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("It is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."). Force is excessive when it is "objectively unreasonable," either because it was "not 'rationally related to a legitimate nonpunitive governmental purpose'" or because "the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 576 U.S. at 397-98 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)).

The objective reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case," without regard to an officer's underlying intent or motivation. *Graham*, 490 U.S. at 396-97. Relevant considerations include but are not limited to:

> [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. These factors are assessed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. Moreover, "[a] court must also account for the 'legitimate interests that stem from the government's need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in the judgment' of jail officials 'are

needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. at

397 (brackets omitted) (quoting *Bell*, 441 U.S. at 547). "[C]ourts applying the objective standard

in the Fourteenth Amendment context" may turn to cases addressing Fourth Amendment

excessive force claims, which are assessed under an "almost identical" standard. *Jacobs*, 8 F.4th

at 195 n.6.

Although the inquiry considers the totality of the circumstances, the *Kingsley* factors

focus heavily on the detainee's conduct. They ask interrelated questions about whether the

plaintiff was "actively resisting," whether he posed a threat or security problem, and whether the

force used was proportional to the "need" for it. In *Jacobs*, the Third Circuit's only published

case applying *Kingsley*'s objective reasonableness standard at summary judgment, the court held

that correctional officers used "wholly gratuitous and objectively unreasonable" force in striking

a "nonthreatening" and "compliant" pretrial detainee. *Id*. at 192, 196-97. The court

acknowledged that correctional officers have special solicitude in the reasonableness analysis,

noting that "'[s]afety and order at these institutions requires the expertise of correctional

officials, who must have substantial discretion to devise reasonable solutions to the problems

they face.'" *Id.* at 195 (quoting *Kingsley*, 576 U.S. at 399). But, obviously, that discretion is

bounded by the Constitution, and the court held that "a jury could find that there was no

penological need" for any force beyond handcuffing when the evidence showed that Jacobs was

"orderly and compliant" in the moments before force was used against him. *Id.* at 195-96.

*Jacobs*'s reasoning suggests that some degree of force is justified when an inmate's

misbehavior poses a risk to "'institutional security'" or undermines "'internal order and

discipline.'" *Kingsley*, 576 U.S. at 397 (quoting *Bell*, 441 U.S. at 547). However, not every

instance of inmate insubordination threatens jail security or disrupts its orderly administration.

In this case, whether Butterworth and Rushin reasonably perceived Sanchez's conduct as doing either is a "disputed, historical fact[] material to the objective reasonableness" analysis that "give[s] rise to a jury issue." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002).  Denial of summary judgment on that basis squares with the Third Circuit's view that, because the objective reasonableness standard is "so fact-dependent," there is a "presumption that the 'reasonableness' of an officer's use of force is typically best left to a jury to determine." *Jefferson v. Lias*, 21 F.4th 74, 79 (3d Cir. 2021).

On the one hand, Butterworth and Rushin argue that their use of control and restraint techniques was an objectively reasonable response to Sanchez's "continued disobedience."  In their motion, they depict Sanchez as a "combative inmate" who was "actively resisting during the entire period force was being used against him."  And they contend that Sanchez's "words and actions were threatening" and created a "significant security risk to BCJ."  A jury could agree with Butterworth and Rushin's factual characterization.

On the other hand, however, reasonable minds viewing the surveillance footage could also find that Sanchez, even if indignant, was neither threatening nor actively resisting.  Those findings would be material, as it is objectively unreasonable for law enforcement to respond to a restrained inmate's nonviolent misbehavior with force that risks serious injury.  *See, e.g., Santini v. Fuentes*, 795 F.3d 410, 420 (3d Cir. 2015) (reversing summary judgment on a Fourth Amendment excessive force claim where a witness to a crime, who conceded that he did not obey commands to keep his hands in plain sight, was subsequently grabbed, tackled, kicked, and pepper sprayed); *El v. City of Pittsburgh*, 975 F.3d 327, 336-37 (3d Cir. 2020) (holding a jury could find it was objectively unreasonable to "slam[]" and "tak[e] . . . to the ground" the plaintiff even when "taking [his] disorderly conduct into account," including ignoring an officer's

instructions).

A review of the video suggests that a reasonable jury could conclude that Sanchez "posed no threat throughout the encounter." *Jacobs*, 8 F.4th at 195.  He was restrained with his hands behind his back during the forceful portions of the encounter.  He was also surrounded on all sides by at least five officers, with a sixth in a nearby office.  He never verbally threatened the officers.  Nor did he make any hand gestures that could have reasonably been interpreted as an attempt to charge or attack.  Arguably, the officers "knew that, as a pretrial detainee, [Sanchez] was highly unlikely to be concealing a weapon on his person." *Boyd v. McNamara*, 74 F.4th 662, 666 (5th Cir. 2023).  And tellingly, nothing in the record intimates that Butterworth and Rushin perceived Sanchez as a danger to their safety.  On these facts, a jury could find that officers would not have reasonably perceived an exigency, which would weigh against the reasonableness of their conduct.  *See, e.g., Jacobs,* 8 F.4th at 194-95, 197 (denying qualified immunity at summary judgment where "a physically restrained and nonthreatening inmate" was repeatedly struck in the head).

Moreover, when viewing the entire incident in the light most favorable to Sanchez, a jury could also find that Sanchez was not actively resisting.   In the minutes leading up to the use of force, Sanchez sat unsupervised in an open jail corridor, patiently waiting for the officers.  When the officers stepped out of the administrator's office to explain his misconduct and consequent transfer, they ordered him to stand up and turn around.  He did so immediately.  To that extent, Sanchez, like Jacobs, was "obeying orders." *Id.*

To be sure, Sanchez was not completely obedient: he did not immediately put both his hands behind his back, he raised his voice and used profanity, and he stopped walking during the escort.  Although they never say so explicitly, Butterworth and Rushin contend that this means

that, as a matter of law, Sanchez was "actively resisting." They point to no authority to support that argument. Meanwhile, because any delay was brief—no more than twenty seconds—and Sanchez's frustration evidently stemmed from his perception of mistreatment, a jury could find that his misconduct was not "active resistance." That finding would support the conclusion that it was unreasonable of Butterworth and Rushin, at least at some point during the encounter, to use force.[1]

Still, Butterworth and Rushin argue that, once pushed to the wall, Sanchez became increasingly physical and uncooperative. They contend that he attempted to kick and that he jerked his head and upper body. Sanchez's physical resistance, they argue, made it necessary to control the situation by pulling him to the ground, restraining his torso and legs, and putting a spit hood on him. But even on this point there is a material dispute of fact. Sanchez, proceeding in this litigation *pro se*, has provided an understandably limited response to the officers' motion. Yet, in spite of its limitations, Sanchez's response makes one point clear: he posits that the surveillance footage shows him not kicking and not "refusing." At summary judgment, his account must be adopted because it is not "'blatantly contradicted' by the video footage." *Id*. at 192 (quoting *Scott*, 550 U.S. at 380). A careful review of the recording shows Sanchez's leg moving up and backward in the second after he was thrown against the wall. Given that his

---

[1] For similar reasons, Butterworth and Rushin's purported compliance with BCJ's Use of Force policy cannot conclusively establish the reasonableness of their conduct. The Use of Force policy outlines the procedures governing the use of force and restraints upon inmates at BCJ. Among other things, it provides that force is "justified when acting staff reasonably believe such force is necessary to: effect compliance with rules, regulations and orders when other methods of control have proven insufficient." It also contains strict protocols for disciplinary transfers, stating that "[i]f, at any time, the inmate does not comply with [the transfer procedure] or staff directions, he will be extracted from the cell or area by an extraction team." The term "extraction," according to the policy, contemplates force greater in degree than handcuffing, pressure points, and control techniques but something less than "active countermeasures" or lethal force. In light of Sanchez's recalcitrance, Butterworth and Rushin argue they complied with the policy. For the reasons explained above, however, there can be reasonable differences of opinion about whether Sanchez "d[id] not comply" and the officers reasonably believed that "other methods of control ha[d] proven insufficient."

9

upper body bore the brunt of the impact, he may have been struggling with his balance.  As *Curley* advises, "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley*, 298 F.3d at 278.  Here, a jury must determine whether the officers reasonably perceived Sanchez's leg movement as a kick and whether that perception, together with the jury's other factual findings, justified an aggressive takedown.

Denial of summary judgment is also supported by the injuries Sanchez claims to have suffered as a result of the incident: migraines from his head hitting the wall and exacerbated ankle pain from the control position used while on the ground.  In excessive force cases, injuries are an "imperfect" proxy for the "severity of the force that caused them." *Crocker v. Beatty*, 995 F.3d 1232, 1251 (11th Cir. 2021) (citation and quotation marks omitted).  The general inference is that the greater the injury, the greater the amount of force used, although even the absence of physical injury does not necessarily mean that force was reasonable. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007).

Butterworth and Rushin question whether the injuries resulted from the subject incident or other events.  They attack the credibility of Sanchez's claim of a head injury, contending that the footage shows that Sanchez's head was not "slammed" into the wall, as his complaint originally alleged.  And, to the extent there was an injury, they say it was "minimal."  But "at the summary judgment stage, a court is not to weigh the evidence or make credibility determinations." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir. 1993).  Those "tasks are left for the fact-finder." *Id.*

In sum, because a jury must resolve facts material to Sanchez's excessive force claim,

summary judgment will be denied.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, J.**

11